# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## MCALLEN DIVISION

| | | |
|---|---|---|
| LETICIA GARZA GALVAN and<br>MARTIE GARCIA VELA,<br>    *Plaintiffs*, | § § § § | |
| **v.** | § § | |
| DAVID WHITLEY, in his official capacity as Texas Secretary of State, and ARMANDINA MARTINEZ, ALMA GARCIA, ALICIA DOUGHERTY NO. 1, ALICIA DOUGHERTY NO. 2, YOLANDA MARTINEZ,<br>    *Defendants.* | § § § § § § § § | CASE No. 7:18-cv-113 |

## DEFENDANT DAVID WHITLEY'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**KEN PAXTON**
Attorney General of Texas

**JEFFERY C. MATEER**
First Assistant Attorney General

**BRANTLEY STARR**
Deputy First Assistant Attorney General

**DARREN L. MCCARTY**
Deputy Attorney General for Civil Litigation

**AMANDA COCHRAN-MCCALL**
Chief, General Litigation Division

**ERIC A. HUDSON**
Southern District ID No. 1000759
Texas Bar No. 24059977

**MICHAEL R. ABRAMS**
Southern District ID No. 2513900
Texas Bar No. 24087072
Attorneys-in-Charge
General Litigation Division
P.O. Box 12548
Capitol Station
Austin, TX 78711-2548
Phone: (512) 463-2120
Fax: (512) 320-0667
*eric.hudson@oag.texas.gov*
*michael.abrams@oag.texas.gov*

**Counsel for David Whitley**

TO THE HONORABLE DISTRICT COURT JUDGE RICARDO H. HINOJOSA—

Plaintiffs Leticia Garza Galvan and Martie Garcia Vela ("Plaintiffs")[1] filed a cross-motion for summary judgment on November 30, 2018, contending that State law provides an inadequate process to challenge a County's Early Voting Ballot Board's ("EVBB") decision to reject a mail-in ballot for failing to comply with all requirements to participate in mail-in voting.

David Whitley,[2] in his official capacity as Texas Secretary of State ("SOS") filed a cross-motion for summary judgment asserting various grounds for dismissing this case. Specifically, the SOS does not enforce or administer the challenged statutory provision. Rather, the responsibility for determining the legality of mail-in ballots rests uniquely and finally with the county-level EVBBs. Because the SOS does not enforce or administer the provision at issue in this litigation, *Ex Parte Young* does not apply.[3]

Second, and for the same reasons, Plaintiffs (a) failed to allege any constitutionally significant injury sufficient to confer standing; (b) cannot demonstrate that their claims are "fairly traceable" to the SOS's conduct; and (c) cannot show that an order enjoining the SOS will redress any purported injury in this case. Accordingly, Plaintiffs lack standing to raise their constitutional challenges against the SOS.

Lastly, under the applicable flexible standard, a requirement that a voter properly complete and submit a mail-in ballot that meets the statutory requirements is not a severe

---

[1] The court struck Plaintiffs' proposed First Amended Complaint, in which Plaintiffs attempted to add other named plaintiffs to this case. Dkt. No. 27. Plaintiffs purported to file their motion along with additional parties.

[2] Rolando Pablos stepped down from the position of Texas Secretary of State effective December 15, 2018. Governor Greg Abbott has since appointed David Whitley to the post. Pursuant to Federal Rule of Civil Procedure 25(d), David Whitley "is automatically substituted as a party."

[3] The SOS reiterates his main arguments here, but intends only to address in this response arguments raised in Plaintiffs' cross-motion for summary judgment. To the extent that the arguments raised in the SOS's *Motion for Summary Judgment* apply to Plaintiffs' cross-motion, SOS stands on its briefing.

restriction on due process rights. Indeed, the burden placed on voters to ensure that they properly and accurately complete the requirements set for mail-in ballots are similar to those placed on in-person voters, who must travel to a designated polling place on Election Day, often necessitating taking time off of work, arranging for childcare, and waiting in line.

The interests advanced by Texas are sufficient to defeat Plaintiffs' challenge: namely preserving the integrity of the election process. The challenged law establishes requirements for submitting mail-in ballots in a good-faith and well-reasoned effort to ensure that the person who submitted the mail-in ballot is the person entitled to cast that ballot, as required by state election law. Texas is well within constitutional bounds in exercising that authority.

Accordingly, this Court should deny Plaintiffs' *Motion for Summary Judgment* and grant the SOS's *Motion for Summary Judgment.*

ARGUMENT AND AUTHORITIES

## I.  The Eleventh Amendment Bars Plaintiffs' Claims Against The Secretary of State

The SOS raised this issue in his *Motion for Summary Judgment. See* Dkt. No. 22 at pp. 7-13. For the sake of brevity, the SOS asserts that the argument applies with equal force to the arguments raised by Plaintiffs, and the SOS stands on the briefing contained in his *Motion for Summary Judgment.*

## II.  Alternatively, Federal Jurisdiction Is Absent Here Because There Is No Case Or Controversy Between Plaintiffs And The SOS[4]

---

[4] It may be that Plaintiffs believe that the SOS is a necessary party to this litigation because they are raising a challenge to the constitutionality of a Texas statute. This understanding would be incorrect. Texas law requires that the Texas Attorney General be served notice of a constitutional challenge, TEX. GOV'T CODE § 402.010(a), as do the Federal Rules of Civil Procedure, FED. R. CIV. P. 5.1(a), but there is no requirement that the SOS must be brought in as a party in every case in which the constitutionality of a Texas voting law is at issue. *See* FED. R. CIV. P. 5.1(c) (providing that "the *attorney general may* intervene within 60 days

Similarly, the SOS raised standing in his *Motion for Summary Judgment. See* Dkt. No. 22 at pp. 13-17. The arguments against standing raised in that motion apply with equal force to Plaintiffs' *Motion for Summary Judgment*, and the SOS adopts those argument as if fully restated here. Because Plaintiffs purport to add other plaintiffs to this litigation through their *Motion for Summary Judgment*, however, it bears mentioning that even if this Court permitted the putative plaintiffs to appear, it would not resolve the standing issues raised.

"'[S]tanding is not dispensed in gross'; a party must have standing to challenge each 'particular inadequacy in government administration.'" *Legacy Cmty. Health Servs., Inc. v. Smith*, 881 F.3d 358, 366 (5th Cir. 2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357-58 & n. 6 (1996)). For the reasons stated in the SOS's pending *Motion for Summary Judgment*, the current Plaintiffs lack standing to seek relief in this case. They did not vote by mail, and at deposition, expressed no desire to vote by mail in the future.

If, however, this Court permits the additional plaintiffs to join this litigation through Plaintiffs' untimely filed amended complaint, the standing arguments bar their new claims, too.

First, one of the new plaintiffs, Amelia Martinez, passed, and therefore, is not a proper party to this case. *See* Dkt. No. 38; Fed. R. Civ. P. 25.

Second, of the three remaining new plaintiffs, Mr. and Mrs. Guerrero did not indicate their qualifications for voting by mail or express any intent to vote by mail in future elections. *See* Dkt. Nos. 25-4; 25-5. The third, Mr. Federico Flores, Jr., did not

---

after the notice is filed or after the court certifies the challenge, whichever is earlier." (emphasis added)). Adding the SOS to this case serves to demonstrate that Plaintiffs are not looking to redress a legal harm by the SOS, but rather are looking to get a judgment against a State official.

4

provide any affidavit or declaration supporting the contention that his mail-in ballot was improperly rejected for failure to meet the signature-matching requirement, or that he intends to vote by mail in future elections.

Third, and more to the point, none of the putative plaintiffs—much like the current Plaintiffs—have provided any competent evidence that an injunction issued from this Court would resolve any dispute with the SOS. In fact, Plaintiffs make no effort to establish the jurisdiction of the Court in their motion or address the glaring standing problems raised.

At bottom, Plaintiffs lack standing to sue the SOS in this case for the reasons set forth in the SOS's *Motion for Summary Judgment*. Amending this case to add additional parties will not resolve that jurisdictional problem.

### III.   Plaintiffs Cannot Meet The High Bar To Prove Texas's Mail-in Voting Regime Is Facially Unconstitutional

"A facial challenge must fail where the statute has a plainly legitimate sweep." *Crawford v. Marion Cty. Elec. Bd.*, 553 U.S. 181, 202 (2008). "When evaluating a neutral, nondiscriminatory regulation of voting procedure, '[the court] must keep in mind that '[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'" *Id.* at 203 (quoting *Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 329 (2006)). Importantly, "a state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts." *Erznoznik v. Jacksonville*, 422 U.S. 205, 216 (1975).

If the most the evidence shows in this case is that the Starr County EVBB unconstitutionally applied state mail-in voting statutes during the March 2018 Democratic Primary, then Plaintiffs have failed to mount a successful facial challenge. *See*

*United States v. Salerno*, 481 U.S. 739, 745 (1987) (To succeed on a facial challenge to a statute, "the challenged must establish that no set of circumstances exists under which the Act would be valid.").

But that is not what the evidence demonstrates.

Plaintiffs argue that Texas's absentee voting process violates procedural due process because it does not include a process for absentee voters to cure their ballot after they have voted and before their ballot is rejected for a signature mismatch. Plaintiffs' exclusive focus on the *post*-voting process fails to account for the entire absentee voting scheme, which provides a constitutionally adequate process for voting absentee in Texas. As demonstrated by the small percentage of ballots rejected during the 2018 Democratic primaries for the cherry-picked counties identified by Plaintiffs, the risk of an erroneous deprivation of the right to vote is slight under the statutory scheme. *See* Dkt. No. 25 at p. 10. In contrast, the burdens on the State of creating an entirely new process for ensuring the identity of mail-in voters would be immense and would nullify any benefit of mail-in voting.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Here, Plaintiffs claim a deprivation of their right to vote. In determining whether the process provided to absentee voters in Texas is constitutionally adequate, this Court should apply the balancing test articulated in *Mathews v. Eldridge* by weighing: (1) Plaintiffs' interest in participating in the democratic process through voting; (2) the risk of erroneous deprivation of the right to vote under the procedures used by the State; and (3) the State's interest, including any extra administrative or financial burden

on the State from requiring additional procedures.[5] *See id.* at 335. In weighing these factors, the court should keep in mind that "due process is flexible and calls for such procedural protections as the particular situation demands."

Texas does not contest that voters have a significant interest in voting. Therefore, the facial challenge turns on whether the risk of erroneous deprivation under the current procedures outweighs the burdens that would be imposed on the State to require the types of additional procedures Plaintiffs request.

First, when restrictions on due process rights of voters are reasonable and not a severe burden—as in this case—the State's important regulatory interests are generally sufficient to justify the restriction. *Burdick*, 504 U.S. at 434. Here, Texas's mail-in ballot requirements promote Texas's interests in—

> ➢ Preserving the integrity of its election process;
>
> ➢ Maintaining an orderly election process and preventing dilution of votes by those who are not eligible to vote; and,
>
> ➢ Administrative convenience and efficiency.

Texas "indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco Cty. Democratic Central Comm.*, 489 U.S. 214, 231 (1989); *see also Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (acknowledging "the State's compelling interest in preventing voter fraud"); *Veasey v. Abbott*, 830 F.3d 216, n. 46 (5th Cir. 2016) (Jones, J., concurring in part and dissenting in part) ("[T]he greatest fraud risk exists when unauthorized persons direct an elderly, immobile voter's choices on a

---

[5] The SOS asserts that *Anderson/Burdick* controls the court's balancing in this case. *See* Dkt. No. 22. That analysis is contained in the SOS's *Motion for Summary Judgment. Id.* To the extent that Plaintiffs argue for a stricter scrutiny under a *Mathews* analysis, that argument lacks merit. However, as noted in the argument that follows, even under a *Mathews* analysis, the Texas statutory scheme for mail-in voting withstands constitutional challenge.

mail-in ballot. That the ballots could get lost or stolen from the mail is no more a risk than the loss of a Social Security check."); *Crawford*, 553 U.S. at 225 (Souter, J., dissenting) (noting that "absentee-ballot fraud . . . is a documented problem"); *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004) ("Voting fraud . . . is facilitated by absentee voting.").

Plaintiffs counter that the vote totals in the 2018 Starr County Democratic Primary show that erroneous deprivation occurred, and that the simple fix would be a requirement to phone or email the voter to ask if they signed their ballot. Dkt. No. 25 at p. 14.

Specifically, Plaintiffs argue that the EVBB rejected "an incredible 13.5%" of mail-in ballots submitted in the March 2018 Democratic Primary. Dkt. No. 1-5 at ¶ 4. Despite Plaintiffs' protestations that they lack any means of challenging rejected ballots, Plaintiffs in this case file an election challenge in a state district court and argued that the mail-in ballots rejected by the EVBB cost them their elections.[6] *See Galvan v. Vera*, 2018 WL 4096383 (Tex.App.—San Antonio Aug. 29, 2018) (not reported). Following a five-day hearing, a district court judge found that "no clear evidence of systemic fraud or error producing protocols was shown." *Id.* at *2. The Fourth Court of Appeals did find that the trial court erred in concluding that a failure to record information on carrier envelopes did not invalidate certain votes. *Id.* at 4. Ultimately, the Fourth Court of Appeals upheld the lower court while pointing out that the fifty votes that should have been invalidated did not alter the outcome of the election. *Id.* at *4.

---

[6] Plaintiffs also had recourse through notice and appeal to a county election officer. If a mail-in ballot is rejected, the EVBB presiding judge is required to deliver written notice to the voter no later than the tenth day after election day. Tex. Elec. Code § 87.0431. "If a county election officer . . . determines that a ballot was incorrectly rejected or accepted by the [EVBB] before the time set for convening the canvassing authority, the county election officer may petition a district court for injunctive or other relief as the court determines appropriate." Tex. Elec. Code § 87.127(a).

Moreover, Plaintiffs' own chart cuts against them when read in conjunction with Plaintiffs' testimony about their use of politiqueras[7] who were arrested and charged with voter fraud. *See, e.g.*, Dkt. No. 22-1 at pp. 38-42. When examining the figures from other counties, Plaintiffs' citation of the Starr County figure could represent an outlier result in the single election cycle—one reflecting the impact of politiqueras harvesting mail-in ballots during the election cycle rather than a heightened risk of erroneous deprivation.

Even if Plaintiffs did not get an election challenge and their chart proved their argument, the reasoning supporting their proposed fix is flawed: a phone call or email would only provide notice, not a fix for the identification issue. The County-level EVBB would still need to verify the voter's identity through some in-person identification or otherwise independently verifiable method. If not through a signature, then the voter would still have to present at a County facility to verify his or her identify, defeating the purpose of mail-in voting.

Further, if the court were to rely on Plaintiffs' numbers, the rejection rate cited by Plaintiffs—with the unexplained exception of Starr County during the 2018 Democratic Primary—is comparable to other variances typical in the conduct of elections. "Circuit courts have uniformly declined to endorse action under § 1983 with respect to garden variety election irregularities." *Griffin v. Burns*, 570 F.2d 1065, 1076, 1078-79 (1st Cir. 1978) (citing to *Hennings v. Grafton*, 523 F.2d 861 (7th Cir. 1975)); *see also Black v. McGuffage*, 209 F. Supp. 2d 889, 893 (N.D. Ill. 2002) (comparing the error rates of different types of vote counting machines, the most accurate of which had error rates

---

[7] *See* John Burnett, Marisa Penaloza, *In Rio Grande Valley, Some Campaign Workers Are Paid To Harvest Votes*, https://www.npr.org/2015/07/07/413463879/in-rio-grande-valley-some-campaign-workers-are-paid-to-harvest-votes (last visited January 11, 2019) (explaining the history, background, and ties to election fraud of politiqueras in the Rio Grande Valley).

ranging from 0.32% to 1.07%). Here, every county except for Starr County had a rejection rate based on mismatch below one percent, suggesting that the problem—to the extent that one existed—stemmed from an issue with Starr County during a single party primary in 2018.

That two candidates participated in a single outlier election in 2018 does not demonstrate a high risk of erroneous deprivation statewide, let alone a risk sufficient to invalidate Texas's mail-in voting regime. Further, it does not justify imposing burdens on the State or the County-level EVBBs to completely alter the mail-in voting signature requirement.

At bottom, Plaintiffs failed to carry their burden to demonstrate a high risk of erroneous deprivation that would justify invalidating or completely reworking mail-in voting in the State of Texas.

## IV.    Texas's Uniform System For Examining Signatures Does Not Violate The Equal Protection Clause

Plaintiffs' second claim is that Texas statutes violate the Equal Protection Clause by failing to contain specific standards governing signature-matching or uniform training for EVBB members. According to Plaintiffs, that means that a rejection in Starr County by the EVBB might be accepted in another county. Dkt. No. 25 at pp. 17-18. And, Plaintiffs contend that proves a violation of the Equal Protection Clause. *Id.*

Plaintiffs' argument fails. Texas law does not subject voters to disparate treatment because all voters are treated the same. When EVBB officials are tasked with authenticating mail-in ballots, a "ballot may be accepted only if . . . neither the voter's signature on the ballot application nor the signature on the carrier envelope certificate is determined to have been executed by a person other than the voter unless signed by a

witness." Tex. Elec. Code § 87.041(b)(2). A uniform standard also applies when authenticating mail-in ballots:

> (e)  In making the determination under Subsection (b)(2), the board may also compare the signatures with any two or more signatures of the voter made within the preceding six years and on file with the county clerk or voter registrar to determine whether the signatures are those of the voter.

> (f)  In making the determination under Subsection (b)(2) for a ballot cast under Chapter 101 or 105, the board shall compare the signature on the carrier envelope or signature cover sheet with the signature of the voter on the federal postcard application.

Tex. Elec. Code § 87.041(e)-(f).

In other words, Texas law uniformly prescribes when ballots must be authenticated via signature comparison, who is tasked with conducting the authentication, which documents should be compared, and what happens if the signatures do not match. No authority holds that, in addition to those uniform requirements, Texas law also must specify a precise mechanism by which EVBB officers determine whether the signature on a ballot matches the signature on a voter registration card. Indeed, the sole appellate authority to address this issue rejected a claim similar to the one Plaintiffs raise here.

In *Lemons v. Bradbury*, 538 F.3d 1098 (9th Cir. 2008), a group of Oregon voters claimed that the state's "procedures for verifying referendum petition signature violated their equal protection and due process rights." *Id.* at 1100. Those procedures, like the procedures at issue in this case, required "county election officials [to] verify sampled referendum signatures by determining whether each petition signature matches the signature on the signer's existing voter registration card." *Id.* at 1101.

A three-judge panel of the Ninth Circuit unanimously rejected the argument that the absence of specific and objective guidance on how to determine whether two

signatures match meant "that county elections officials lack[ed] uniform statewide rules for verifying referendum signatures," in violation of *Bush v. Gore*. *Id.* at 1102. The court concluded that, "[e]ven were *Bush* applicable to more than the one election to which the [Supreme] Court appears to have limited it, Oregon's standard for verifying referendum signatures would be sufficiently uniform and specific to ensure equal treatment of voters." *Id.* at 1106. This was because "[t]he Secretary uniformly instructs county elections officials to verify referendum signatures by determining whether each petition signature matches the signature on the signer's voter registration card," and "all counties refused to consider extrinsic evidence" beyond the referendum and voter card signatures. *Id.* Moreover, *Lemons* rejected the plaintiff's argument, echoed by Plaintiffs here, that "differences in the number of signatures rejected by various counties" demonstrated "the absence of a uniform standard," noting that, "[m]ost importantly, uniform standards can produce different results." *Id.* at 1106-07.

At bottom, the Court of Appeals ruled that a signature-match requirement is itself a uniform standard, i.e., that a "standard for verifying" signatures is "sufficiently uniform and specific to ensure equal treatment of voters" if state law "uniformly instructs county election officials to verify" those signatures "by determining whether each . . . signature matches the signature on the signer's voter registration card." *Id.* at 1106. And, similar to the regime at issue in *Lemons*, the law governing Texas's signature-match requirement also provides "sufficient guarantees of equal protection," *id.*, including procedural protections reasonably calculated to guard against the risk of error in verifying a signature match.

Further, Plaintiffs' reliance on *Bush v. Gore* is misplaced. The Court there expressly and unambiguously explained that the precedential significance of its decision

12

was "limited to the present circumstances, for the problem of equal protection in election processes generally presents many complexities." 531 U.S. at 109. And the Court precisely identified "the present circumstances" to which its ruling was confined: "a situation where a state court with the power to assure uniformity has ordered a statewide recount with minimal procedural safeguards." *Id.* "When a court orders a statewide remedy," the Court explained, "there must be at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied." *Id.*

Such circumstances are not present here. Indeed, Plaintiffs ask this Court to do what the Supreme Court in *Bush v. Gore* disapproved—to replace preexisting statutory requirements governing the conduct of an election with judicially promulgated procedures put in place after voters have already cast their ballots. *See id.*

Rather than identify analogous precedent examining signature-match requirements, Plaintiffs rely on *Bush v. Gore*. Plaintiffs cite no Fifth Circuit case or extra circuit-level case holding or even suggesting that a signature-match requirement impermissibly burdens the right to vote.

In sum, relevant caselaw holds that a signature-verification requirement does not impermissibly burden the right to vote; Plaintiffs cite no persuasive authority going the other way; and based on the record before this Court, Plaintiffs have not adduced proof of discriminatory intent or purpose. Accordingly, Plaintiffs cannot meet their summary judgment burden to demonstrate an Equal Protection Clause violation in this case.

## CONCLUSION

For the foregoing reasons, Plaintiffs' *Motion for Summary Judgment* should be denied.

**Dated:** January 11, 2019.

**Respectfully submitted**.

**KEN PAXTON**
Attorney General of Texas

**JEFFERY C. MATEER**
First Assistant Attorney General

**BRANTLEY STARR**
Deputy First Assistant Attorney General

**DARREN L. MCCARTY**
Deputy Attorney General for Civil Litigation

**AMANDA COCHRAN-MCCALL**
Acting Chief - General Litigation


    */s/ **Eric A. Hudson***
**ERIC A. HUDSON**
Texas Bar No. 24059977
Southern District No. 1000759
Attorney-in-Charge
**MICHAEL R. ABRAMS**
Southern District ID No. 2513900
Texas Bar No. 24087072
**H. CARL MYERS**
Texas Bar No. 24046502
Southern District No. 852368
Assistant Attorney Generals
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 463-2120
Facsimile: (512) 320-0667
eric.hudson@oag.texas.gov
michael.abrams@oag.texas.gov

**Counsel for Defendant David Whitley**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed electronically with the Court and delivered by CM/ECF on January 11, 2019, to all counsel of record.


                                 ***/s/ Eric A. Hudson***

Eric A. Hudson
Assistant Attorney General