IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| FEDERICO FLORES, JR., et al. *Plaintiffs*, | § § § § | |
| v. | § § § | Civil Case No. 7:18-cv-00113 |
| DAVID WHITLEY, in his official capacity as Texas Secretary of State, et al., *Defendants*. | § § § § § | DECLARATORY AND INJUNCTIVE RELIEF REQUESTED |

## **PLAINTIFFS' AMENDED JOINT MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs FEDERICO FLORES, MARIA GUERRERO, and VICENTE GUERRERO jointly move for summary judgment against the Secretary of State and the Defendant members of the Starr County Early Voting Ballot Board, for the reasons that follow and for any additional reasons that may appear of record or at any hearing on this motion.

### Introduction

Plaintiffs are three Starr County voters who all testified that they signed their own mail-ballot applications and carrier envelopes (containing the voted ballot) with respect to the March 2018 Democratic Primary election, yet whose votes were rejected for a perceived discrepancy in these signatures. Plaintiffs challenge Texas law as a violation of procedural due process under the Fourteenth Amendment.

Plaintiffs do not contend that mail balloting is constitutionally required, but once a state creates such a regime, it "must administer it in accordance with the Constitution." *La Follette v. Padilla*, No. CPF-17-515931 (Cal. Sup. Ct., San Francisco County Mar. 5, 2018) (quoting *Zessar*

1

*Flores v. Secretary of State*: Plfs' Amended MSJ

*v. Helander*, No. 05-C-1917, 2006 WL 642646 at *6 (N.D. Ill. 2006)).[1] When Plaintiffs filed this case in April 2018, federal and state courts had already invalidated deficient procedures like Texas's in Illinois, Florida, and Arizona. Since that time, federal courts in Georgia and New Hampshire have likewise invalidated those states' signature-mismatch statutes for lack of constitutionally sufficient process. In fact, there does not appear to be a single reported case upholding a statutory regime like Texas's against a procedural due process challenge. Plaintiffs are entitled to judgment as a matter of law.

## Factual and Statutory Background

### I. The Plaintiffs

Plaintiffs Maria and Vicente Guerrero are married and reside together at their home. *See* **Exhibits 3 & 4**. They both signed their own name on their applications and carrier envelopes for the March 2018 primary elections.[2] When Maria was signing her application to vote by mail, she was worried about running out of space to write her whole name because she wanted to be careful not to write over the word "Date" printed in the box for the signature. *Deposition of M. Guerrero*. Therefore, she consciously left two letters out of her name as she signed the application. *Id.*

Plaintiff Federico Flores, Jr., 79 years old, is a life-long Starr County resident. **Exhibit 2** (F. Flores depo.) at 4:14. Mr. Flores testified that he has voted in Starr County elections essentially as long as he can remember. *Id.* at 8-9. Mr. Flores testified that he "vote[s] here from the house all the time." *Id.* at 9:17. He testified that he signed his own name on his mail-ballot application and carrier envelope for the March 2018 primary elections. *Id.* at 12:15, 14:10; *see also* **Exhibit**

---

[1] A copy of this order from the California state district court in *La Follette* is attached as **Exhibit 1**.

[2] The Guerreros were deposed on July 25, 2019, and the transcripts have not yet been supplied to counsel. The deposition excerpts will be filed as supplemental exhibits when they are received.

2 (Flores BBM application and carrier envelope). Mr. Flores explained that, after a stroke, "sometimes I struggle with the letters." *Id.* at 17:11. He testified that he would have liked for election officials to have called him to confirm his ballot before rejecting his vote. *Id.* at 21-22 ("Well, I say that they should have called to confirm, and that way I could have a chance to tell them.").

All three of these voter Plaintiffs' ballots were rejected for perceived signature discrepancy by the Starr County Early Voting Ballot Board. **Exhibit 5**.

## II. Summary of Texas framework for applying for, and returning, ballot by mail, and delivery of timely-returned ballots to the Early Voting Ballot Board

Eligible voters in Texas may request a ballot to be voted by mail starting with the beginning of the year of the election. Tex. Elec. Code § 84.007(c). Election administrators must send the mail ballot to the voter within seven days after the clerk accepts the application (if the ballots are already available) or seven days after the ballots become available, as applicable. *Id.* § 86.004(a).[3] After completing the ballot, the marked ballot must be mailed back such that it arrives at the elections office before the polls close on Election Day, or by 5:00 p.m. on the day after Election Day, if the carrier envelope was postmarked for delivery by 7:00 p.m. on Election Day. *Id.* § 86.007(a).

Because ballots are generally available approximately several weeks before a given primary election day, voters commonly return marked mail ballots to the elections administrators several weeks before Primary Election Day. However, the ballots are not received and reviewed by the Early Voting Ballot Board (EVBB), to determine whether they meet the requirements for being counted, until much later.

---

[3] Some details are left out of this summary, for example, regarding earlier deadlines for sending mail ballots to overseas and military voters.

When a carrier envelope is received by the early voting clerk, the clerk determines whether it is timely and, if so, "the clerk shall enclose the carrier envelope and the voter's early voting ballot application in a jacket envelope." *Id.* 86.011(a), (b). The clerk shall also include in the jacket envelope a copy of the voter's federal postcard application if the ballot is voted under chapter 101, and the signature cover sheet, if the ballot is voted under Chapter 105. *Id.* 86.011(b). The early voting clerk holds the jacket envelopes for the timely-delivered mail ballots until they are delivered to the EVBB, along with the other materials required to be delivered to the EVBB (like the ballot boxes, poll lists, list of registered voters, etc.) at a later date determined by statute. Tex. Elec. Code 87.021 - .024. The date of delivery to the EVBB can vary depending on the type of election equipment used and the population of the county conducting the election.

While the "general rule" states that "the materials" shall be delivered to the EVBB during the time the polls are open on election day, *id.* § 87.022, it appears that, in most elections, the materials may be delivered beginning when early voting by personal appearance concludes, with an earlier delivery date possible in elections conducted by populous counties.

In elections using paper ballots for early voting in person or by mail, elections in which early voting in-person is done on "voting machines," and elections in which early voting ballots are to be "counted by automatic tabulating equipment at a central counting station," the jacket envelopes may be delivered to the board "between the end of the period for early voting by personal appearance and the closing of the polls on election day, or as soon after closing as practicable[.]" *Id.* § 87.0221; *see also* §§ 87.023, 87.024.

In an election conducted by authority of a county with a population of 100,000 or more (or conducted jointly with such a county), the jacket envelopes may be delivered to the EVBB between

4

the end of the *ninth* day before the conclusion of early voting and the close of polls on Election Day. *Id.* 87.0222.

### III. Procedure for appointment of Early Voting Ballot Board

The EVBB consists of a presiding judge and at least two other members. Tex. Elec. Code § 87.002(a).

In a primary election, the county chair of the political party appoints the presiding judge. *See* § 87.002(b) ("Except as provided by Subsection (d) [dealing with general election for state and county officers], the presiding judge is appointed in the same manner as a presiding election judge."); § 32.001, .006 (each precinct must have a presiding and alternate election judge, and in a primary, "the judges for each precinct" are appointed by county chair).

The presiding judge then appoints the other members of the EVBB. 87.002(b) (("Except as provided by Subsection (c) [dealing with general election for state and county officers], the other members are appointed by the presiding judge in the same manner as the precinct election clerks."); § 32.031 ("The presiding judge for each election precinct shall appoint the election clerks to assist the judge in the conduct of an election at the polling place served by the judge.").

### IV. Qualifying ballots voted by mail

The Election Code distinguishes the process of reviewing mail-in ballots to determine whether to accept them from the process of counting the ballots, once they have been accepted. Tex. Elec. Code 87.0241.

"The [EVBB] may determine whether to accept early voting ballots voted by mail in accordance with Section 87.041 at any time after the ballots are delivered to the board." *Id.* 87.0241(a).

5

*Flores v. Secretary of State*: Plfs' Amended MSJ

Therefore, only after the ballots are delivered to the EVBB may it examine them to determine if the particular ballots will be accepted or rejected. Election Code § 87.041, "Accepting Voter," describes the EVBB's review:

> (a) The early voting ballot board shall open each jacket envelope for an early voting ballot voted by mail and determine whether to accept the voter's ballot.
>
> (b) A ballot may be accepted only if:
>
>> (1) the carrier envelope certificate is properly executed;
>>
>> **(2) neither the voter's signature on the ballot application nor the signature on the carrier envelope certificate is determined to have been executed by a person other than the voter, unless signed by a witness;**
>>
>> (3) the voter's ballot application states a legal ground for early voting by mail;
>>
>> (4) the voter is registered to vote, if registration is required by law;
>>
>> (5) the address to which the ballot was mailed to the voter, as indicated by the application, was outside the voter's county of residence, if the ground for early voting is absence from the county of residence;
>>
>> (6) for a voter to whom a statement of residence form was required to be sent under Section 86.002(a), the statement of residence is returned in the carrier envelope and indicates that the voter satisfies the residence requirements prescribed by Section 63.0011; and
>>
>> (7) the address to which the ballot was mailed to the voter is an address that is otherwise required by Sections 84.002 and 86.003.
>
> (c) If a ballot is accepted, the board shall enter the voter's name on the poll list unless the form of the list makes it impracticable to do so. The names of the voters casting ballots by mail shall be listed separately on the poll list from those casting ballots by personal appearance.
>
> **(d) A ballot shall be rejected if any requirement prescribed by Subsection (b) is not satisfied. In that case, the board shall indicate the rejection by entering "rejected" on the carrier envelope and on the corresponding jacket envelope.**
>
> (e) In making the determination under Subsection (b)(2), the board may also compare the signatures with any two or more signatures of the voter made within the preceding six years and on file with the county clerk or voter registrar to determine whether the signatures are those of the voter.
>
> (f) In making the determination under Subsection (b)(2) for a ballot cast under Chapter 101 or 105, the board shall compare the signature on the carrier envelope or signature cover sheet with the signature of the voter on the federal postcard application.
>
> (g) A person commits an offense if the person intentionally accepts a ballot for voting or causes a ballot to be accepted for voting that the person knows does not

meet the requirements of Subsection (b). An offense under this subsection is a Class A misdemeanor.

Tex. Elec. Code Ann. § 87.041 (emphasis added).

Accepted ballots are removed from the carrier envelope (while remaining within the "ballot envelope") and set aside to be counted, and rejected carrier envelopes are placed into a larger envelope and sealed. *Id.* § 87.043(a), (b).

The presiding judge of the EVBB is required to provide written notice to the voter of the reason a mail ballot was rejected, but is only required to do so within 10 days after the election. *Id.* 87.0431.

While notice is thus provided for the reason a ballot was rejected, there is no process afforded *the voter* to rectify any deficiency with the carrier envelope that caused the rejection.

While the voter is afforded no means of challenging the rejection of his or her own ballot, the 85th Legislature added a provision permitting a "county election officer" a very limited means of challenging a determination made by the EVBB, but only with court process and, in many cases, only after securing permission from the county chair of all political parties:

> (a) If a county election officer, as defined by Section 31.091, determines a ballot was incorrectly rejected or accepted by the early voting ballot board before the time set for convening the canvassing authority, the county election officer may petition a district court for injunctive or other relief as the court determines appropriate.
>
> (b) In an election ordered by the governor or by a county judge, the county election officer must confer with and establish the agreement of the county chair of each political party before petitioning the district court.

Tex. Elec. Code § 87.127.

**V.    The EVBB's effectively unreviewable authority to reject mail ballots contrasted with the process for review of provisional ballots.**

Voters may vote provisionally pursuant to Election Code § 63.011.

7

*Flores v. Secretary of State*: Plfs' Amended MSJ

The presiding judge of each precinct in which provisional ballots were cast is required to personally deliver them to the EVBB. *Id.* § 65.053. The statute specifically directs the "secretary of state" to "prescribe procedures by which the early voting ballot board may have access to the provisional ballots as necessary to implement this chapter." *Id.*

If a voter is accepted for provisional voting because he or she does not meet the voter ID requirements of Section 63.001(b), the voter has <u>six days after the election day</u> in which to either present an acceptable form of ID "to the voter registrar for examination," or execute an affidavit in the voter registrar's presence. *Id.* § 65.0541. Here again, the Legislature directed the Secretary of State to prescribe procedures necessary to implement this section. *Id.*

The EVBB must then "verify and count provisional ballots as provided by this subchapter" within either thirteen days (general election for state and county officers) or nine days after election day. *Id.* §§ 65.051(a), (a-1).

The EVBB's review of provisional ballots to determine whether a ballot is acceptable involves the application of somewhat complex statutes/regulations and requires the board to make factual determinations:

> (a) The early voting ballot board shall examine each affidavit executed under Section 63.011 and determine whether to accept the provisional ballot of the voter who executed the affidavit.
>
> (b) A provisional ballot shall be accepted if the board determines that:
>
>> (1) from the information in the affidavit or contained in public records, the person is eligible to vote in the election and has not previously voted in that election;
>>
>> (2) the person:
>>
>>> (A) meets the identification requirements of Section 63.001(b) at the time the ballot was cast or in the period prescribed under Section 65.0541;
>>>
>>> (B) notwithstanding Chapter 110, Civil Practice and Remedies Code, executes an affidavit under penalty of perjury that states the voter has a religious objection to being photographed and the voter has consistently

8

> refused to be photographed for any governmental purpose from the time the voter has held this belief; or
>
> (C) executes an affidavit under penalty of perjury that states the voter does not have any identification meeting the requirements of Section 63.001(b) as a result of a natural disaster that was declared by the president of the United States or the governor, occurred not earlier than 45 days before the date the ballot was cast, and caused the destruction of or inability to access the voter's identification; and
>
> (3) the voter has not been challenged and voted a provisional ballot solely because the voter did not meet the requirements for identification prescribed by Section 63.001(b).
>
> (c) If a provisional ballot is accepted, the board shall enter the voter's name on a list of voters whose provisional ballots are accepted.
>
> (d) If a provisional ballot is rejected, the board shall indicate the rejection by marking "rejected" on the envelope containing the provisional ballot.

Tex. Elec. Code Ann. § 65.054.

Because deciding whether a provisional vote is acceptable can necessitate review of voter registration records, the Election Code directs the Secretary of State to prescribe procedures by which the voter registrar shall provide assistance to the EVBB in reviewing the ballots. (In elections held on the date of the general election for state and county officers, "the procedures must allow for seven calendar days for the voter registrar to review a provisional voter's eligibility."). *Id.* § 65.052.

Accepted provisional ballots are then to be counted in the manner provided for counting of other early voting ballots. *Id.* § 65.057.

**VI.  Signature rejections in Starr County in the March 2018 Primary Elections.**

In the March 2018 Primary election in Starr County, 1123 mail-in ballots were submitted by Starr County voters. **Exhibit 6B**. Of those, 976 were accepted and 147 were rejected. *Id.* (see Excel spreadsheets listing all ballots accepted and rejected). Of the 147 rejects, all but one of them were rejected for perceived signature mismatch. **Exhibit 6A** ("Notice of Rejected Ballot letters

issued to Starr County voters). Thus, of all mail ballots submitted in Starr County, more than 13% were rejected for perceived signature discrepancies.

## VII. Testimony of Dr. Linton Mohammed

Plaintiffs designated Dr. Linton Mohammed, an expert in handwriting and forensic document examination. **Exhibit 7** (Dr. Mohammed expert decl.).[4] Dr. Mohammed reviewed the Texas statutes and concluded that "elections officials are likely to make erroneous signature-comparison determinations." *Id.* ¶ 29. Dr. Mohammed attests that determining whether a signature is genuine is a "difficult task for even a trained FDE (Forensic Document Examiner)." *Id.* ¶ 30. Laypersons have been determined to have a significantly higher rate of error, even under controlled conditions with appropriate lighting, equipment including magnification, and time, as compared to trained FDEs, *id.*, and "laypersons are also more likely to wrongly determine that authentic signatures are not genuine than to make the opposite error." *Id.*; *see also id.* ¶ 43. Dr. Mohammed notes that a person's signature can vary from time to time for "myriad reasons, including age, health, native language, and writing conditions, and that laypersons incorrectly perceive normal variation due to such factors to be a "difference" indicating that another person signed. *Id.*; *see also id.* ¶ 36 (further discussing variation versus differences), ¶¶ 38-40 (further detail as to the differences in types of signatures and explaining how the same individual's signature can vary significantly, and why training is required to identify variation versus differences that indicate a non-genuine signature). Laypersons' "failure to properly account for signature *variability* leads to erroneous *inauthenticity* determinations, which are particularly pronounced in populations with greater signature variability, such as elderly, disabled, ill, and non-native English signatories." *Id.* ¶ 31 (emphasis added).

---

[4] Dr. Mohammed's CV is at **Exhibit 8**.

Dr. Mohammed further notes that ten signature samples are required for an accurate signature determination to account for an individual's signature variability, and faults Texas law for requiring a comparison of only one other signature to the signature on the ballot envelope. *Id.* ¶ 33.

Dr. Mohammed further notes that FDEs are tested for "form blindness," a type of impairment in visual perception that affects an individual's ability to accurately authenticate handwriting. *Id.* 32. Ballot board members are not examined for form blindness.

Further, insufficient time examining signatures is conducive to making errors. *Id.* ¶ 37. He concluded that reliable signature comparison is impossible for even trained FDEs under the time constraints and other limitations of the Texas system. *See id.* ¶¶ 47-50.

## Argument

### I. Summary Judgment Standard

Summary judgment is appropriate "where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Breen v. Texas A&M Univ.,* 485 F.3d 325, 331 (5th Cir. 2007) (citing Fed. R. Civ. P. 56(c)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1423 n.11 (5th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The nonmoving party's bare allegations, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247-48. Moreover, conclusory allegations unsupported by specific facts will not prevent an award of summary judgment; the nonmovant cannot rest on his allegations to get to a jury without any significant probative evidence tending to support his position. *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio*,

40 F. 3d 698, 713 (5th Cir. 1994). If a reasonable jury could not return a verdict for the nonmoving party, then summary judgment is appropriate. *Liberty Lobby, Inc.*, 477 U.S. at 248. The nonmovant's burden cannot be satisfied by conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (internal quotations omitted). Furthermore, it is not the function of the court to search the record on the nonmovant's behalf for evidence which may raise a fact issue. *Topalian v. Ehrman*, 954 F.2d 1125, 1137 n.30 (5th Cir. 1992). Therefore, "although we consider the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the nonmovant, the nonmoving party may not rest on the mere allegations or denials of its pleadings, but must respond by setting forth specific facts indicating a genuine issue for trial." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 735 (5th Cir. 2000) (internal quotation omitted).

II. **The Lack of An Opportunity to Cure by Validating the Ballot Violates the Right to Vote and Procedural Due Process.**

a. **Procedural due process standard**

To determine what process is due, courts, including the Fifth Circuit, analyze the three factors identified in *Mathews v. Eldridge*:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 334-35 (1976). *See, e.g.*, *Wilson v. Birnberg*, 667 F.3d 591, 601 (5th Cir. 2012) (applying *Mathews* factors in analyzing candidate's challenge to Texas statute governing rejection of application for place on the ballot).

Texas's ballot by mail rejection scheme affords constitutionally insufficient process for the same reasons that similar statutes in other states have been invalidated. *E.g.*, *Martin v. Kemp*, 341

12

F. Supp. 3d 1326, __, (N.D. Ga. 2018), ; *Saucedo v. Gardner*, 335 F. Supp. 3d 202 (D. N.H. 2018); *Zessar v. Helander*, 05-C-1917, 2006 WL 642646 (N.D. Ill. Mar. 13, 2006).

### b. Private interest

The private interest involved here is the fundamental right to vote, which is denied to a voter who finds herself disenfranchised due to a perceived signature mismatch. "It is beyond dispute that the right to vote is of the most fundamental significance under our constitutional structure." *Saucedo*, 335 F. Supp. 3d at 217 (internal quotations omitted). While there is no fundamental right to vote *by mail*, "the privilege of absentee voting is certainly deserving of due process," and once the state provides a means of voting by mail, it must be administered in accordance with due process. *Id.* (internal quotations omitted); *Zessar*, 2006 WL 642646, at *6 ("There is no question that the federal constitution does not require states to create absentee voting regimes…[b]ut once they create such a regime, they must administer it in accordance with the Constitution."). This Court should accord significant weight to this factor, as the *Saucedo* court did, 335 F. Supp. 3d at 217, because in the event of an erroneous deprivation under current law, "there is no recourse for the voter and no way to remedy the loss of that vote in that election." *Zessar*, 2006 WL 642646, at *7.

### c. Risk of erroneous deprivation and probable value of additional or substitute procedures

There is a substantial risk of an erroneous determination of a signature mismatch that will disenfranchise a voter, given that lay election officials are empowered to reject ballots based on a simple eyeball comparison of signatures. Ballot board members under Texas law are required to have no training in handwriting analysis, and the State does not provide any. Even in the absence of any expert testimony as to handwriting analysis, federal courts have recognized that "the task

13
*Flores v. Secretary of State*: Plfs' Amended MSJ

of handwriting analysis by laypersons…is fraught with error." *Kemp,* 341 F. Supp. 3d at 1339 (quoting *Saucedo, supra*, at 217, which featured the deposition testimony of Dr. Mohammed).

Plaintiffs here have produced the same expert from *Saucedo*, whose testimony establishes that, even if ballot board members were to undergo some training, it still would be insufficient to allow a sufficient handwriting analysis. Dr. Mohammed avers that even an expert handwriting analyst requires ten signature samples and sufficient time, in appropriate conditions including proper lighting and magnification equipment, to make a reliable determination whether a given signature is genuine.

Not only is the risk of erroneous deprivation high, but it is exceedingly simple to protect against this risk with additional procedures. A perceived signature mismatch flagged by the ballot board would require no more than a simple phone call, email, or letter to the voter, who could verify that she indeed cast the ballot in question. Even where federal courts have acknowledged that the risk of erroneous deprivation may be *minimal*, they have still found this factor favors the plaintiffs challenging such statutes because the remedy is so very simple. *E.g.*, *Martin*, 341 F. Supp. 3d at 1339 ("While the Court recognizes that the risk of an erroneous deprivation is by no means enormous, permitting an absentee voter to resolve an alleged signature discrepancy nevertheless has the very tangible benefit of avoiding disenfranchisement."); *Zessar*, 2006 WL 642646, at *9 ("It is apparent that the risk of erroneous deprivation of the protected interest in absentee voting is not enormous, but the probable value of an additional procedure is likewise great in that it serves to protect the fundamental right to vote.").

d. **Government's interest**

The courts that have declared mail-ballot rejection regimes like Texas's invalid, and mandated additional procedures to comply with the constitution, have recognized the strong

interest the State has in "maintaining the integrity of elections" and avoiding unnecessary burdens. *Martin*, 341 F. Supp. 3d at 1339; *Saucedo*, 335 F. Supp. 3d at 220. However, they have held that providing voters a means of curing or validating a perceived signature mismatch imposes minimal burdens that are not only justified. *Martin*, 341 F. Supp. 3d at 1339; *Saucedo*, 335 F. Supp. 3d at 220-21, but actually further the state's interest in detecting fraudulent votes, *Saucedo, supra*, at *220; *Fla. Democratic Party v. Detzner*, 2016 WL 6090943, at *7; *Zessar*, 2006 WL 642646 at *9.

Texas already provides a means for those who cast provisional ballots to provide certain documentation to election officials within a period of days after Election Day, for example, documents reflecting their true residency and eligibility to vote. This necessarily already tasks election officials in every county in Texas with making factual determinations as to whether a provisional voter was eligible to vote and whether their vote should be counted, during a certain period after the election. There is no reason Texas cannot afford the same period of time for those whose ballots are identified as perceived signature mismatch to confirm that they indeed submitted the ballot and signed the envelope, so that the ballot may be counted. Voters are already invited, when the apply to vote by mail, to supply their "phone number and/or email address," "in case our office has questions." *See, e.g.*, Exhibit 4 (V. Guerrero provided his phone number). The only question at issue is confirming the voters' identity—that they did submit the ballot, not somebody else pretending to be them. Affording this process would actually assist in combatting fraudulent voting, by requiring the contacting of voters with questionable signatures, which would permit the validation of valid ballots and assist state authorities in identifying those instances in which the voter did not actually sign the envelope attributed to them. If the Court believes a more formal process would be appropriate, it may require some kind of written reply from the voter, or even a

15

*Flores v. Secretary of State*: Plfs' Amended MSJ

personal visit to the voting office (for those who can do so).  Whatever level of formality is judged to be necessary, some manner of simply verifying that the voter cast the ballot that was submitted in her name can be easily implemented.

## Conclusion

For the above reasons, Plaintiffs respectfully request that the Court grant this motion for summary judgment and enter a declaratory judgment declaring the challenged statutes and procedures unconstitutional.  Plaintiffs further request that, after any consideration the Court deems necessary of the particular additional procedures appropriate, including additional submissions by the parties, the Court enter a permanent injunction by separate order, requiring that constitutionally sufficient procedures be afforded to voters.  Plaintiffs further request any additional relief to which they are justly entitled.

Respectfully submitted,

_____
Jerad Wayne Najvar
Tex. Bar No. 24068079
Southern Dist. No. 1155651
jerad@najvarlaw.com
2180 North Loop West, Suite 255
Houston, TX 77018
281.404.4696 phone
281.582.4138 fax
*Attorney in Charge for Plaintiffs*

*Of Counsel*:

NAJVAR LAW FIRM, PLLC
Austin M.B. Whatley
Texas Bar No. 24104681
austin@najvarlaw.com
2180 North Loop West, Ste. 255

16
*Flores v. Secretary of State*: Plfs' Amended MSJ

Houston, TX 77018
Tel.: (281) 404-4696
Fax: (281) 582-4138

Martie Garcia Vela
Texas Bar No. 24058898
martie.garcia@gmail.com
LAW OFFICE OF MARTIE GARCIA VELA, PC
509 N. San Antonio
Rio Grande City, TX 78582
Tel.: (713) 927-4433

## Certificate of Service

The undersigned counsel hereby certifies that on July 29, 2019, the foregoing document, and any accompanying exhibits and proposed order, was served on the counsel of record in this matter by means of the court's CM/ECF system:

Mr. Michael Abrams
PO Box 12548, Capitol Station
Austin, TX 78711
*Counsel for Defendant Pablos*

Mr. Martin Golando
Mr. Jose Garza
405 N. Saint Mary's, Suite 700
San Antonio, TX 78205
*Counsel for ballot board Defendants*

                                                           /s/ Jerad Najvar
                                                            Jerad Najvar