IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| FEDERICO FLORES, JR., et al., §<br>§<br>*Plaintiffs*, §<br>§ Civil Case No. 7:18-cv-00113<br>v. §<br>§<br>RUTH R. HUGHS, IN HER OFFICIAL §<br>CAPACITY AS TEXAS SECRETARY §<br>OF STATE, et al., §<br>§<br>*Defendants*. | |

**PLAINTIFFS' REPLY IN SUPPORT OF
<u>SECOND AMENDED JOINT MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiffs file this reply, jointly addressing the responses of both Secretary of State Hughs (Doc. 96) and the Early Voting Ballot Board (EVBB) Defendants (Doc. 98).

**Argument**

I. **Texas's Current Ballot Rejection Procedures Regarding Perceived Mismatched-Signature Ballots Violate Procedural Due Process, and Facial Relief is Appropriate.**

The EVBB Defendants make no attempt to defend the constitutionality of Texas's current procedures. The Secretary acknowledges that the Court "indicated an inclination to grant Plaintiffs relief" at an earlier hearing, Doc. 96 at 8, and simply incorporates her earlier briefing as to the merits without lodging any new arguments, *id.* at 9. The Secretary does make a passing argument that Election Code § 87.127 provides sufficient process, but here framed as a challenge to the propriety of facial relief. *Id.* at 5-6. The Secretary's argument is not persuasive.

First, to whatever limited extent the Secretary offers § 87.127 as a constitutionally sufficient procedure to protect the right to vote, this Court has already recognized that it is not

1

sufficient. Several paragraphs are required to attempt to describe all the ways in which § 87.127 is insufficient. *See Plaintiffs' Reply* (Doc. 77) at 6-7. To summarize, it (i) is not available to the voter personally, but requires the voter to plead with another county official to take action; (ii) whether to take action is entirely in the county officer's discretion (no action is required); (iii) no standards guide the officer's decision to take any action or simply ignore the voter; (iv) even if the county election officer is inclined to take action, the timetable is vanishingly short in the best of circumstances (*i.e.*, if the EVBB sent immediate notice, which is not required), but particularly if the jurisdiction decides to canvass early; (v) even if the county election officer decided to try to get a ballot counted, it requires the extraordinary and expensive action of locating and hiring an attorney available to prosecute an emergency injunction request, which then burdens the court system and county finances.

Moreover, the Secretary conveniently avoids the fact that, in order for a voter to even *know* he or she needs to plead with a local official to take discretionary action, that voter would have to receive the Notice of Rejected Ballot sufficiently in advance of the canvass to set the above actions in motion, allowing time for the county election officer to locate and hire the lawyer, file an emergency lawsuit, and secure an injunction. Under the current statute, nothing guarantees the voter timely notice (sufficiently before the canvass) that his or her ballot was even rejected.

Ironically, while the Secretary in another breath suggests concern that the Plaintiffs' proposed remedy could affect the canvassing date of elections in certain circumstances (which is not true, as described below), it is actually the Secretary's reliance on emergency lawsuits filed immediately before a canvass that would threaten to require delays in election schedules.

Additionally, in many elections, even if a voter prostrated himself in front of the county election official and convinced him to attempt wasteful, emergency litigation that may very likely

delay the canvass, such action is still not permitted unless the officer "confer[s] with and establish[es] the agreement of the county chair of each political party before petitioning the district court." Tex. Elec. Code § 87.127(b). The due process and voting rights of any affected voter cannot be made contingent upon successfully twisting the arms of both political parties to agree to attempt to cure the violation.[1]

Thus, the Court has already correctly concluded that § 87.127 is not a constitutionally adequate cure process.

*Second*, the Secretary's objection to *facial* relief in this case, Doc. 96 at 5, is unavailing. Texas's current statutory regime is facially invalid, regardless of the specific formulation of the test for facial validity, for precisely the same reasons explained by the federal district courts in *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 213-14 (D.N.H. 2018), and *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1336-37 (N.D. Ga. 2018) (explaining that "the Court can readily ascertain from the statute, as written, whether the procedures therein comport with due process" in a facial challenge, and "the opportunity to be heard either is—or is not—provided by the statute on its face"). *See discussion at Plfs' Reply* (Doc. 77) at 3-4. There is literally *no* circumstance in which the rejection of a mail ballot for a signature discrepancy, perceived by a lay official, is constitutional in the absence of a pre-deprivation *opportunity* to cure. As demonstrated elsewhere, whether a given ballot would ultimately be valid and counted is irrelevant to the injury visited by the lack of constitutional due process. *See* Doc. 72 at 5 (discussing *Carey v. Piphus*, et al.). Therefore, failure to provide timely notice of a slated rejection, and request verification that the voter submitted the

---

[1] A "facial challenge to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual." *Freedom Path, Inc. v. Internal Revenue Service*, 913 F.3d 503, 508 (5th Cir. 2019). Therefore, it does not matter whether this additional restriction applied to the March 2018 election that provided the immediate impetus for this lawsuit, because the court must examine the statutory regime on its face.

3

mail ballot received in his or her name, violates procedural due process regardless of whether the ballot is ultimately approved or any other circumstances involving such ballot.

The Secretary does not seem to quibble as much with the foregoing analysis as with the very idea of a facial challenge itself. That is, the Secretary complains that, while these three voter Plaintiffs may have had their ballots rejected, they all are in Starr County and have not proved that other ballots have been improperly rejected in other counties. Doc. 96 at 5. But this argument reflects the Secretary's misapprehension of the nature of the due process injury here, or the nature of a facial challenge, or both.

The injury-in-fact in this case is the lack of a constitutionally sufficient process, which the statute lacks on its face. In other words, whether any one of these three Plaintiffs, or any other voter, would ultimately succeed in validating his or her ballot, is irrelevant to the constitutional injury, as shown under the authorities cited above. Given that the constitutional injury is the lack of a process—regardless of whether any particular voter's ballot would ultimately be determined to be acceptable—this injury is realized by any voter whose ballot is slated for rejection for perceived signature mismatch. Nothing more is necessary to show a constitutional violation. Therefore, any voter whose ballot is slated for rejection for perceived signature discrepancies, anywhere in Texas, suffers the same constitutional violation. Plaintiffs fully incorporate here their exhibits filed earlier in this case demonstrating the number of mail ballots received in Starr and other selected counties in the March 2018 primary elections, and the number accepted and rejected, and rejected for signature mismatch, in each county. (Filed as Exhibits 7 (Duval Records); 8 (Jim Hogg records); 9 (Hidalgo records) 10 (Dallas records); and 11 (Galveston records) to Doc. 25). Notably, this represents a selection of counties, both large, medium, and small, from across Texas. The summary is as follows:

| County | BBM received | BBM Accepted | BBM Rejected | Rejected-signature mismatch | % of all received BBM rejected for signature mismatch |
|---|---|---|---|---|---|
| Starr[2] | 1125 | 976 | 147 | 146 | **13.06%** |
| Duval | 955 | 920 | 35 | 4 | 0.42% |
| Jim Hogg | 367 | 364 | 3 | 3 | 0.82% |
| Hidalgo | 2758 | 2716 | 42 | 3 | 0.11% |
| Dallas (Democratic) | 7826 | 7820 | 40 | 13 | 0.17% |
| Dallas (Republican) | 8939 | 8917 | 33 | 23 | 0.26% |
| Galveston | 3927 | 3859 | 68 | 23 | 0.59% |

As the table reflects, every county surveyed reported mail ballots rejected for perceived signature mismatch, and therefore voters who had no constitutionally-required cure opportunity.

To the extent the Secretary objects to the fact that a single plaintiff (or these three from Starr County) can bring a facial challenge to a state statute, and secure an order holding that the statute is facially unconstitutional, the Secretary is complaining about an established feature of constitutional adjudication. *See, e.g.*, *Citizens United v. FEC*, 558 U.S. 310, 333 (2010) (facially invalidating federal statute in suit brought by single entity on its own behalf); *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 426-27 (5th Cir. 2014) (facially invalidating provisions of Texas Election Code in suit brought by three political committees from Bexar County); *Saucedo*, 335 F. Supp. 3d at 206, 213-14 (holding New Hampshire signature-match requirement facially unconstitutional as violation of procedural due process, in suit brought by three voters).

---

[2] The Starr County records are attached to Plaintiffs' Amended Mtn. for Summ. Judg. (Doc. 67) as Exhibit 6A and 6B, which have already been incorporated as part of Plaintiffs' Second Amended Mtn. for Summ. Judg.

## II. Plaintiffs Have Standing to Sue the Secretary of State.

The Secretary argues that "Plaintiffs lack standing to sue the Secretary of State," arguing that Plaintiffs cannot satisfy the causation and redressability prongs of standing. Doc. 96 at 2-5. The Secretary argues that "EVBBs implement the provisions of the Texas Election Code related to mail-in ballots, not the Secretary of State." *Id.* at 4. This is a rehashing of the argument the Secretary already made in its dispositive motions, and this Court has already rejected it.

Although she never mentions *OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017), that case forecloses the Secretary's standing argument. The Fifth Circuit recognized that the local (county) election officials were responsible for administering the challenged voter interpreter statute at the polling place, and that the election judges had done nothing more than execute a "straightforward application" of the statute, *id.* at 613, but rejected Texas's argument that such facts meant the State and the Secretary were not proper Defendants. The Court wrote:

> The facial invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the State itself and its Secretary of State, who serves as the "chief election officer of the state."

867 F.3d at 613 (quoting Tex. Elec. Code § 31.001(a)). Under *OCA-Greater Houston*, Plaintiffs have standing against the Secretary, despite the fact that she cannot "control" local election officials completely.[3]

## III. The EVBB Defendants Are Proper Parties In Their Official Capacities.

The EVBB Defendants acknowledged on March 26, 2020 that "any Declaratory Relief or Injunctive Relief granted against the Texas Secretary of State regarding additional notice and cure opportunities for rejected ballots will of course be applicable to the local Defendants." Doc. 91 (EVBB Defendants' proposed order). On March 30, the Court granted the EVBB Defendants'

---

[3] Plaintiffs' full argument on this point is found at Doc. 71 at 4-7, and Doc. 71 at 4-11.

motion to dismiss as to qualified immunity, but denied it in all other respects, meaning they remain Defendants in their official capacities. Doc. 93. In response to the Second Amended Motion for Summary Judgment, the EVBB Defendants do not defend the statute on its merits, but now claim that their "inclusion … i[n] this case is unnecessary," referring to the Secretary's authority as the chief election officer. Doc. 98 at 1-2. While the EVBB Defendants are correct that the Secretary is a proper party, they were also correct on March 26 in that relief should be granted against the ballot board members in their official capacities as well. Plaintiffs incorporate their discussion of this point from Doc. 76 at 3-5. The fact that state or local officials charged with enforcement of a challenged law had no responsibility in writing it, and no discretion in execution, does not change the fact that they are proper defendants, and proper subjects of a remedial injunction. *See id.*

## IV. The Secretary Raises No Persuasive Challenges to Plaintiffs' Proposed Remedy.

### a. Declaratory judgment

Aside from the general argument regarding standing to sue the Secretary of State (an argument foreclosed by *OCA-Greater Houston*, as explained above), no Defendant offers any challenge to the Plaintiffs' request for a declaratory judgment that the challenged statute(s) violate procedural due process.

### b. Prohibitory injunction

No party offers any objection to a simple prohibitory injunction, enjoining the enforcement of the current challenged provision unless and until the Secretary and/or the State implement an adequate cure process.

### c. Mandatory injunction

Regarding a mandatory injunction, the Secretary suggested that the Plaintiffs propose a precise remedy tailored to Texas law, and Plaintiffs did so, suggesting the Signature Cure

Declaration that would be made available in a timely manner to affected voters. Plaintiffs explained how this remedy works seamlessly with Texas's extant process and timetable for processing provisional ballots in every election. Notably, the Secretary has not identified any specific objections to this proposed remedy, aside from the very general and unsubstantiated points which Plaintiffs respond to here.

> **i. Plaintiffs' suggested remedy would function just like the injunctions entered in *OCA-Greater Houston* and *Veasey*.**

The Secretary's objection that "the Court cannot order the Secretary … to force local officials to comply with Secretary of State guidance, because the Secretary lacks the power under Texas law to compel compliance to begin with" (Doc. 96 at 5) is answered by *OCA-Greater Houston*, as explained *supra*. District courts have entered injunctions just as requested here, which, after declaring a Texas election law invalid, direct the Secretary of State to implement remedial measures.

Plaintiffs have described in detail the injunctions entered by the district courts in *OCA-Greater Houston* and *Veasy v. Abbott*, 2:13-cv-00193 (S.D. Tex. Aug. 10, 2016). *See Plfs' Second Amd. Mtn. for Summ. Judg.* (Doc. 94) at 9-10. In both cases, just as here, local election officials were responsible for applying the requirements of state law as polling or other election responsibilities were conducted, yet the courts recognized the Secretary's authority as the "Chief Election Officer" of Texas, and required the Secretary to exercise his authority over local officials to implement the Court's order. Plaintiffs have even placed here in the record the Secretary's own representation to the district court in *Veasey* that "as the State's chief election officer," the Secretary "is committed to providing effective education to election officials on *how to implement the interim remedy order*." Plfs' Exhibit 11 at 7 (emphasis added). The Secretary's apparent strategy in this litigation—to ignore *OCA-Greater Houston*, the injunctive orders entered in that

8

case and in *Veasey*, and its own affirmative representation to the *Veasey* court—are certainly bold, though not persuasive.

> ii. **The Secretary's suggested process would threaten delays, while Plaintiffs' remedy works seamlessly within statutory election schedules.**

The Signature Cure Declaration process as suggested by Plaintiffs would work within the timeline on which local election officials already must process provisional ballots. So, while the Secretary objects that officials "would always be required to wait until at least the seventh day after the election to conduct the canvass, if any mail-in ballot has been rejected for a signature mismatch," Doc. 96 at 6, this is already true if there is but a single provisional ballot cast in the election. Moreover, if there are any jurisdictions that actually canvass an election within six days of the election when there are no provisional ballots, the Secretary has not offered any examples or even argued that it is common. Even if it were common, the right of a voter to have her legitimate ballot counted certainly can be accommodated, especially where the process for doing so operates on the timeline already applicable to provisional ballots and without disturbing the statutory deadline for the canvass. Surely a voter's due process rights to avoid illegal disenfranchisement prevail over a hypothetical and random desire of some jurisdiction to maybe canvass an election earlier than required by the law.

Moreover, ironically, the Secretary's suggestion that affected voters should simply rely on haphazard, emergency litigation filed immediately before a canvass provides far more potential for chaos and delays, not to mention completely unnecessary expenses for local officials and the courts.

> iii. **The Secretary does not substantiate the referenced "costs"**

Far from being "unfair," *see* Doc. 96 at 7, the nominal "costs" associated with the remedy are so negligible as to be almost irrelevant. The only marginal "cost" the Secretary claims is that

9

of mailing the cure declaration to the voter, but the declaration would be included in the same envelope with the Notice of Rejected Ballot that the presiding judge of the EVBB is *already required to provide by mail*. As for the emails and phone calls, this does not require any additional expenditure by any county—which already has phone and internet service—and the marginal time involved is negligible, given that, even in the largest counties, the number of ballots rejected for signature mismatch is very small. *See* table *supra* at 5 (reflecting that far fewer than 1% of submitted mail ballots are rejected for signature mistmatch; indeed, the highest number of such ballots other than in Starr in March 2018 was a total of *36 voters* in Dallas County, out of more than 16,000 mail ballots submitted).

Even if there were real costs associated with this remedy, it would not be a reason to leave an unconstitutional process in place. Happily, because there are virtually no marginal costs involved, this is not even a consideration.

### iv. Plaintiffs' remedy would further combat vote fraud.

Courts have consistently also found that providing voters a means of curing or validating a perceived signature mismatch imposes minimal burdens that are not only justified, *Martin*, 341 F. Supp. 3d at 1339; *Saucedo*, 335 F. Supp. 3d at 220-21, but actually further the state's interest in detecting fraudulent votes, *Saucedo*, *supra*, at 220; *Fla. Democratic Party*, 2016 WL 6090943, at *7; *Zessar*, 2006 WL 642646 at *9. Under Texas's current regime, signature-mistmatch ballots are not required to be investigated for fraud, they are simply thrown out, with no requirement that anybody look into the situation. If the Secretary's position is that such ballots present a threat of fraud, it is odd that she has not touted any efforts being undertaken to investigate those ballots. Thus, while the current regime results in valid votes being nullified by local election officials, the state is simply ignoring those that it claims may be fraudulent. By contrast, if Plaintiff's remedy

is instituted, requiring election officials to contact voters, this will not only provide the voter timely notice and opportunity to validate they he or she did actually submit a ballot, but if a voter did not submit the ballot received in his or her name, election authorities will be apprised of such fact sooner (because the voter will reply with surprise at the notice that a mail-ballot was submitted in her name). Nothing about Plaintiffs' remedy precludes any competent law enforcement agency, whether the local district attorney or the Attorney General, from enforcing the Election Code provisions prohibiting voting in the name of another, providing illegal assistance with a mail ballot, etc., in the normal course. Neither does the cure process preclude candidates from filing election contests, just as they can under current law, to challenge allegedly illegal mail ballots.

The proposed remedy will therefore *facilitate* knowledge of potential fraudulent ballots, although it is unclear whether the Secretary is actually serious about investigating them, given that she resists any suggested method of contacting the affected voters.

### v. Plenty of time remains for implementation of a remedy order

The Secretary's suggestion that yet another election should expire with Texas voters (primarily elderly and infirm voters like the three Plaintiffs here) illegally disenfranchised before the Court remedies the constitutional problems identified in October is off-base. First, and most importantly, there is certainly no time pinch between now and the July 14 runoff elections that in any way impedes implementation of a remedy order. The Florida statute was corrected after plaintiffs filed suit October 3, 2016, and the federal district court entered an injunction less than two weeks later, implementing the same cure-by-declaration process Plaintiffs suggest here. *See* docket in *Detzner I*, 4:16-cv-607-MW/CAS, 2016 WL 6090943 (N.D. Fla.). In *Detzner II*, voters filed another lawsuit *after* the November general election, and during a pending recount, to ensure a constitutional cure process applied under Florida's amended statutory scheme in an attempt to

get their votes counted in that election. *Democratic Executive Committee of Florida v. Detzner*, 347 F. Supp. 3d 1017, 1021 n.1 (N.D. Fla. 2018). The district court entered a preliminary injunction on November 15, 2018, mandating cure procedures in an ongoing election. *Id.* Georgia voters sued on October 15, 2018, the district court issued an order on October 24, and then a final TRO on October 25, to be implemented with respect to ballots in the election then occurring. *Martin v. Kemp*, 1:18-cv-4776-LMM, 341 F. Supp. 3d 1326 (N.D. Ga. 2018).[4] *See also* cases cited at *id.* at 1336 n.6. In short, there is plenty of time to implement a remedy order here, even if Plaintiffs had just now filed this suit. Instead, the issues have been fully and comprehensively litigated.

As noted above, the Secretary's bald claim that the proposed remedy imposes anything more than negligible administrative burdens is unsubstantiated and illogical. At most, the same election officials already responsible for processing any provisional voters' attempts to validate their provisional ballots will be tasked with accepting and reviewing a simple, one-page reply declaration from affected voters. As illustrated in the foregoing cases, the cure for this signature mismatch issue is exceedingly simple, requires very little to no training to implement because it is so simple, and has been ordered and enforced within mere days of an impending election (in Florida), and even after election day (in Georgia).

\* \* \*

Defendants have now had a full opportunity to respond to the proposed remedy filing requested by the Court, and the most notable aspect of the responses is that nobody has even attempted to explain with any persuasive force why the proposed remedy is inappropriate or otherwise problematic.

---

[4] The court's docket is available online at https://www.courtlistener.com/docket/8034954/martin-v-kemp/.

Respectfully submitted,

   */s/ Jerad Wayne Najvar*
Jerad Wayne Najvar
Tex. Bar No. 24068079
S.D. Tex. No. 1155651
jerad@najvarlaw.com
2180 North Loop West, Suite 255
Houston, TX 77018
281.404.4696 phone
281.582.4138 fax
*Attorney in Charge for Plaintiffs*

*Of counsel:*
NAJVAR LAW FIRM, PLLC
Austin M.B. Whatley
Tex. Bar No. 24104681
S.D. Tex. No. 3348472
2180 North Loop West, Ste. 255
Houston, TX 77018
281.410.2003 phone
austin@najvarlaw.com

## Certificate of Service

      The undersigned counsel hereby certifies that on April 29, 2020, the foregoing document, along with any exhibits and proposed order, was served on the following counsel of record in this matter by means of the court's CM/ECF system:

Mr. Michael R. Abrams
PO Box 12548, Capitol Station
Austin, TX 78711
*Counsel for Defendant Ruth R. Hughs*

Mr. Martin Golando
405 N. Saint Mary's, Suite 700
San Antonio, TX 78205
*Counsel for ballot board Defendants*

   */s/ Jerad Najvar*
   Jerad Najvar